PINNER *vs.* SHARP and wife.

1. In view of the extraordinary circumstances under which the contract sought to be enforced was made, and its purely unilateral character, the court, in the exercise of its discretion, left the complainant to his action at law.

2. No decree can be made against a wife to execute a deed.

The cause was argued on the pleadings and proofs.

*Mr. A. Kirkpatrick,* for complainant.

*Mr. A. A. Clark* and *Mr. H. M. Gaston,* for defendants.

THE VICE-CHANCELLOR.

The complainant, Moritz Pinner, seeks, by this suit, the specific performance of an agreement made by the defendants, Jacob F. Sharp and wife, for the conveyance to Pinner of their farm of one hundred and thirty acres, in the county of Somerset, situated on the southerly side of the Central railroad, at Finderne, two miles east of Somerville. The agreement is in writing, dated and executed on the 2d of July, 1870. The defendants admit that they signed it, but deny that they read it, or were made aware of its contents. Their defence is that they were led to sign it upon a misrepresentation of its terms and effect.

Fifty acres of the farm are high lands, suitable for building, and adjoin the road on the north. The remaining eighty are meadow lands, lying south of the highlands, and are about equally divided by the Raritan river running through them from west to east. The buildings on the upper portion next to the road are a large dwelling-house, barn, and other outbuildings suitable for farming purposes. The farm was occupied by the tenants of the defendants, their own residence being near, on the opposite side of the road.

The complainant, a resident of Perth Amboy, doing busi-

ness in New York, and a dealer in real estate, had learned from Garret Van Doren, a real estate agent at Somerville, that the farm was for sale, that the price was $26,000, and that Sharp was willing to give the refusal of it for three months, at that price, for the sum of $100. On the 2d of July he went out to Finderne, according to appointment, and met the defendants for the first time. Sharp was absent on his arrival, but returning towards noon, met Pinner while examining the land. They looked at it together, and then went to Sharp's house, where, after dinner, Pinner drew up the agreement in the hall. When the defendants had signed it, Sharp's son, a lad of seventeen, and also a domestic, were called in at Pinner's request and signed it as witnesses. Pinner said he was in haste and desirous to return to New York with the train. It does not certainly appear how long he staid at the house. He says from one to three hours. He took the writing and rode back to Somerville with Sharp.

The agreement is of considerable length, covering four pages of a large letter sheet, with no erasures, and three slight interlineations noted above the witnesses' names. Its provisions are particular and exact, evincing, in the clear expression and orderly arrangement of them, the skill of an experienced draftsman. It is entirely unilateral, and gives him the refusal of the farm for six months instead of three, for the price of $20,000 instead of $26,000, and for the payment down of $50 instead of $100. Sharp admits that his terms, as originally communicated to Pinner, were altered as to the length of time the refusal was to last and the sum to be paid down, but in nothing else.

The agreement goes on to provide that $1450 shall be paid at the end of six months, if a deed shall then be required; that the balance of the price, $18,500, shall be secured by mortgage on the premises, payable in five years, with interest at seven per cent., payable yearly; that if, upon survey, the farm should be found to be more than one hundred and thirty acres, nothing should be added to the price, but if less than one hundred and twenty-eight acres, a proportionate re-

duction should be made; that the title should be free of encumbrances; that possession should be given at the end of the period limited for the deed; that the mortgage should contain the conditions that Pinner and his legal representatives should have the right to construct, on and through the farm and homestead, roads, streets, drives, and avenues, to occupy in all no more than fifteen acres; and such roads, streets, drives, and avenues were then to be forever released and freed from the action and consequences of the mortgage, or any unpaid part of it; that Pinner and his legal representatives should have the right to release portions of the farm and homestead from time to time, at option, by paying to Sharp and wife, or the parties then holding the mortgage, an amount equal to $200 per acre for every acre, lot, or portion of land so released or to be released; such payments to be credited on the mortgage; that Pinner and his legal representatives should have the right to deposit with the clerk of the county of Somerset all the money tendered, or to be tendered, at any time in payment of any portion of the farm or homestead so to be released, should Sharp and wife, or their legal representatives, be inaccessible or refuse to receive such money, or to release such portions as above, and that the receipt of the clerk of said county for such money, and the designation in said receipt or receipts of said portions thus to be released, should act as a complete release of such portion of land from the action and consequences of said mortgage or any unpaid part thereof; that Pinner and his legal representatives, at his or their option, should have the right to dispose of the farm and homestead in parts and fractions, taking in payment for such parts and fractions, mortgages on such parts and fractions; and such mortgages on such parts and fractions should be accepted by Sharp and wife, or their legal representatives, or the holder of said mortgage, as part payments of and towards the amount of the same; *provided* always, that the mortgages thus to be tendered in part payment should not encumber the parts or fractions of land for which the same should have been given, to an extent exceed-

ing $200 per acre; that up to the time that $3500 should have been paid on account of said mortgage, the buildings on the farm should be and remain insured for $4000, and the insurance given as collateral with the mortgage.

The accounts given by Sharp and wife and their son, in regard to the preparation and execution of this agreement, are in direct and irreconcilable conflict with that given by Pinner. Sharp says that when he met Pinner on the farm on the 2d of July, he told him he had come to get the refusal of it for his brother-in-law, in Prussia or France, provided he would come; that Pinner said Van Doren had told him he wanted $26,000 for the farm; that Pinner expressed no opinion as to that; that not a word was said, while they were walking around the farm, about purchasing; that nothing was said, before or during dinner, about the contract or terms of purchase. Pinner says that where they met, the drift of the conversation was to get the refusal for a certain length of time; that the conversation with reference to the price took place in the house, and, he thinks, also in the road; that no one was by through the whole conversation, excepting at short intervals, Mrs. Sharp; that the paper was written in the hall; that he was desirous of returning to New York in the afternoon, and having no great time to spare, began writing the contract, and, to save re-writing, talked over carefully with Sharp each particular point, term, and condition, before it was put down in writing; that the agreement was read to him and his wife before signing; that each clause and section was read to Sharp immediately after it was written, to have an understanding between them whether or not it expressed the ideas they intended it to convey; and that after the whole had been written, ready for signature, Mr. Sharp sat alongside of him and Mrs. Sharp close by, looking into the paper while he was reading it.

Sharp and wife swear that not a word of it was read to her. Sharp says she wished it read, but Pinner answered by saying it was not binding. She says that after dinner her husband came in where she was, for paper, and said Pinner

wanted to write a piece of writing for the refusal of the place for six months, if she were willing, and she said she was; Pinner was in the hall, but the door was open; she says: "My attention was not called to it afterwards till I was asked to sign the paper; I was in the dining-room, next to the hall, when Mr. Sharp called me; I went in the hall; I told Mr. Pinner I thought there was a great deal of writing for the refusal of the farm, and I refused to sign the writing till I had seen either Lawyer Clark or Gaston; he said I need not be afraid to sign it, there was nothing binding; it was only to show that it was for the refusal of the farm for six months, if he could get his brother-in-law to come—if not, he did not want it; he did not want it for himself; he said it took six months to get word from his brother-in-law, and if the letter came at the close of six months he would come and bargain for the place; if not, there would be no more of it; then I signed the paper and went out; I signed the paper because Mr. Pinner said the paper was not binding; no part was read to me, not a word of it, before I signed it."

Her son, Philemon Sharp, being called by the complainant as attesting witness to the agreement, on his cross-examination swore—"I was sent for to sign my name; Mr. Pinner said he wanted me to sign my name to articles of agreement for the refusal of the farm for six months; my mother, in my presence, said she would rather go to Somerville, and have some lawyer see the writing; Mr. Pinner replied, it is nothing binding, it is only the refusal of the farm for six months; my mother spoke about going to Somerville to consult a lawyer, as I think, before I signed my name, but it was after she had signed, I am sure; Mr. Pinner's exact words were, 'It is nothing binding, only the refusal of the farm for six months;' my mother didn't seem satisfied with this; I don't remember whether she said anything further; I know my mother was not satisfied, because she spoke about it that night, afterwards; she said she would rather have gone to Somerville, to consult some lawyer."

Sharp swears—"After dinner, he said he would like to

have the refusal, in case he could get his brother-in-law to come; he said this in the hall; we were then alone; he wanted the refusal for six months, for $50; he said nothing as to the price for which he wanted the refusal; nothing was said by either, at that time, as to terms or conditions; nothing about a mortgage; we did not bargain for the farm; I did not tell him in what way I wanted the $26,000 paid; we were conversing five minutes before he began to write; I do not think he spoke to me while writing, further than to say it took a very clear head to write such a writing; after the writing was done, he read a little part of it, and wanted me to sign; I do not remember how much he read to me— I do not think as much as two pages; I did not notice at the time that he did not read the whole of it; he read a little, and said the rest was not binding; I could not say positive that he did not read the whole of it; I paid no attention to it; I am sure he told me it was a refusal for the farm before I signed it; Mrs. Sharp was not present during the writing; I signed the paper as a refusal of the farm for $50."

The foregoing statements exhibit briefly the substance of their contradictory stories. Their testimony is extensive and minute. It is unnecessary to review it in detail.

The paper was left by Pinner at the clerk's office. Sharp says he first learned the conditions of it from Mr. Van Doren, in August following, or the last of July, who then told him where it was, and what it contained. The complainant has offered evidence to contradict this, and to show that Sharp said after Pinner had left, on the day the contract was signed, that he had given the refusal for the price of $20,000. The real estate agent, Van Doren, testifies that he saw Sharp at the depot that afternoon with Pinner, and that he thinks he told him that he had sold the refusal for $50, and for that price, but he does not speak positively; and I am satisfied, from the other evidence in the cause, and from his mis-recollection of other particulars to which he speaks, that he did not see him then, and that Sharp's story, that he first learned

the details of the paper from the copy of it obtained from the clerk, may be true.

Several witnesses have testified to the value of the farm when this contract was made. It appears satisfactorily, I think, that it was worth $26,000, the sum originally asked. Witnesses were also sworn to impeach Pinner's character, but without success. Their testimony on that point, is illegal in kind, and weak in degree. He describes himself as a Prussian by birth, and as a resident of this country since 1851, engaged in the business of selling patents. Being unmarried, he did not want the farm for himself. His testimony is clear, positive, and consistent with itself, comparing, in these respects, by no means unfavorably with Sharp's. In examining the evidence of both, as taken before the master, and without knowledge or observation of either, I am unable to say with confidence, where or what the truth is. It is difficult to see how a man of mature years and average sense, as Sharp must be presumed to be, could receive money and execute a paper for the refusal of his farm for six months, relying upon the assurance of the stranger who wrote it, that it would not be binding. It is little less to be wondered at that he signed at all, a document drawn by a stranger with interests adverse to his own, without reading it *himself*; without submitting it to an adviser, and without keeping a copy. That he did so, however, is certain. The latter facts may serve, perhaps, to make it more credible that he signed it upon a general assurance and belief of its purport, and without attending to a possibly hasty, imperfect, or unintelligible reading. But this is not to be accepted without plenary proof. Sealed instruments, executed voluntarily, by competent parties, are not to be lightly impeached. To set aside the contract made in this case, the fraud or deception set up must be clearly and conclusively proved. The presumptions are against it. This, however, is not a suit by the defendants to have the contract annulled, but an application to the extraordinary jurisdiction of equity to enforce it. A contract, though valid in law, and sufficient for the recovery of damages, may not be such as

equity will decree to be performed. It rests by the familiar rules in the sound discretion of the court, to enforce it, or leave the parties to their remedies at law. This discretion is not the exercise of an arbitrary will, but of judgment guided by principles and reasons.

In the present case no special equities are presented by the complainant. The original suggestion that his relatives in Europe were coming to occupy the farm, is substantially withdrawn. It is apparent from the contract itself, that the complainant had ulterior ends. He wants it only to sell again, and because its value is greater than the price he is to pay. The injury, if any, is entirely pecuniary, and can be covered by damages at law. The contract is unilateral, and not mutual. It binds the defendants to convey, but not him to take. Optional contracts are not favored in equity, though if founded on consideration, and free from objections in other respects, are enforced. The provisions of this contract are unusual, and favorable to the complainant and unfavorable to the defendants, both as to conditions and price ; and this disparity is apparent on its face. The price is less than could easily have been obtained at a prompt sale and on ordinary terms ; and while I cannot regard the price as inadequate or the bargain as unconscionable in the sense of the law, they are not without influence in connection with the other facts of the case. The circumstances attending its preparation and execution, as related by the complainant himself, are well calculated to engender distrust. It is difficult to see how, in the space of that single and limited interview, this bargain, widely different from that originally proposed, and with peculiar details, could have been deliberately and intelligently made. As to the defendant, Mrs. Sharp, it is admitted it was not. Whatever discussion and consideration were had, were necessarily hasty and brief. Sharp, himself, was evidently far less than the equal of the complainant, by whom the contract was drawn, if it be true that its provisions were then and there conceived and arranged. While the defendant may perhaps be liable at law for his rash and ill-advised acts, and

bound by his bargain however indiscreet, I cannot regard the complainant, upon his own statement of the extraordinary circumstances of the case, and the hurried nature of the transaction, excluding the customary deliberation and advisement that would have placed his bargain beyond suspicion and impeachment, and such as a prudent and fair-minded man would have allowed, as entitled to the aid of this court in securing the fruits of his remarkable persuasiveness and skill. The positive evidence of the defendants goes to confirm this conclusion. Another reason for leaving the complainant to his action at law is, that his bill seeks a decree against Sharp and *his wife*. The land was not hers. In *Young* v. *Paul*, 2 *Stockt*. 404, which was a suit for specific performance, Chancellor Williamson says : " It is objected that the wife is not a party to the bill, and that no decree can be made against her to execute the deed. No decree could be made against her if she were a party. If she had actually signed the agreement with her husband, it would have been absolutely void as to her, and no suit at law or equity could be maintained against her upon such an agreement. A *feme covert* cannot make any contract, either with or without the consent of her husband, except as to her separate estate. Our late statutes respecting the rights of married women do not affect this principle of the common law."

In *Hawralty* v. *Warren*, 3 *C. E. Green* 124, where the complainant in his bill for a conveyance asked a title requiring the execution of the conveyance by the wife, and it appeared that the wife was unwilling to convey, Chancellor Zabriskie says : " The court will not order a defendant to procure a conveyance or release by his wife, or require him to furnish an indemnity against her right of dower, unless in cases of fraud, where her refusal is shown to be by procurement on his part ; and that, in case of a mere optional contract, it is much better to leave the party to his remedy at law."

I shall advise, in this case, that the bill be dismissed.